UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

MAY 2 8 2013

JEFFREY S. GASSAWAY,           )
                               )
        Plaintiff,             )
                               )
v.                             )   1:12-cv-00982 (IDD)
                               )
CAROLYN W. COLVIN,             )
Acting Commissioner of Social Security, )
                               )
        Defendant.             )
_____)

## MEMORANDUM OPINION

This matter is before the Court on the parties' cross-motions for summary judgment (Dkt. Nos. 13, 18). Pursuant to 42 U.S.C. § 405(g), Jeffrey Gassaway ("Plaintiff") seeks judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner" or "Defendant") denying his claim for disability insurance benefits ("DBI") and supplemental security income ("SSI") under Title XVI of the Social Security Act (the Act), 42 U.S.C. §§ 1381 – 1383f. For the reasons stated below, the Court finds that Defendant's decision is supported by substantial evidence, and that there is no evidence warranting remand. Accordingly, the Court GRANTS summary judgment for Defendant and DENIES summary judgment for Plaintiff.

### I.   PROCEDURAL BACKGROUND

On May 19, 2009, Plaintiff filed an application for DBI and SSI alleging his disability began on May 12, 2009 arising from "stroke, diabetic, [and] intercranial bleeding." (Administrative Record "AR" 206, 210.) Plaintiff's initial claim was denied on September 23, 2009 (AR 121-26). It was denied again upon reconsideration on April 8, 2010. (AR 130-35.)

1

On April 14, 2010, Plaintiff requested a hearing before an administrative law judge ("ALJ"), and a hearing was held on February 15, 2011 before ALJ Kenneth Bryant. (AR 13 – 26.)

On March 10, 2011, the ALJ issued a decision denying Plaintiff's claim, finding that he was not disabled within the meaning of the Act. (*Id.*) Plaintiff requested a review of the ALJ's decision, and on June 29, 2012, the Appeals Council denied the request. (AR 1.) The Appeals Council's denial of Plaintiff's request rendered the ALJ's decision the final decision of the Commissioner for purposes of review under 42 U.S.C. § 405(g).

On August 31, 2012, Plaintiff filed the instant suit in this Court, challenging the ALJ's decision. (Dkt. No. 1.) Cross-motions for summary judgment were filed and this matter is ripe for disposition.

## II. FACTUAL BACKGROUND

Plaintiff was born in 1971 and was thirty-seven years old as of May 12, 2009, the date he alleges he became unable to work.[1] (AR 191.) On May 12, 2009, Plaintiff was admitted to Stafford Hospital in Stafford, Virginia for a left basal ganglia hemorrhagic stroke with expressive aphasia and mild right hemiparesis. (AR 306.) This was documented by a CT scan showing intraparenchymal hemorrhage on the left side of the brain in the frontal lobe with adjacent white matter edema and some effacement of the frontal horn of the left lateral ventricle. (AR 301.)

In his disability application, Plaintiff reported that he lives with his family and they prepare his meals.[2] (AR 218, 220.) Plaintiff checked the box listed "**NO PROBLEM** with personal care." (AR 219 (emphasis in original).) Plaintiff indicated that he cleans and does some laundry without help or encouragement. (AR 220.) Plaintiff checked that he could walk,

---

[1] The Court finds it immaterial that in September 2008 Plaintiff was laid off. The alleged date that Plaintiff became unable to work, May 12, 2009, is the date relevant to the ALJ's decision.

[2] As an additional explanation for why Plaintiff did not prepare his meals, Plaintiff stated, "The stroke was recent." (Administrative Record ("AR") 220.)

2

drive, go out alone, shop in stores for personal items twice a week, handle finances, and watch television daily. (AR 221-22.) Plaintiff noted that he had to stop every twenty-five yards for a few minutes when walking. (AR 223.) Plaintiff wrote that he has no problems paying attention and that he finishes what he starts. (*Id.*)

On September 17, 2009, Dr. Christopher Newell, consultatively examined Plaintiff at the request of the state agency. (AR 351-56.) In describing Plaintiff's daily activities, Dr. Newell listed that Plaintiff is independent in dressing and bathing. (AR 352.) Dr. Newell opined that Plaintiff "is able to hear and comprehend normal conversational speech. He has some mild stuttering, soft speech, but is, for the most part, comprehendible." (*Id.*) Dr. Newell found that Plaintiff's "thought processes are linear and logical," that he has a "good fund of knowledge," and that he "follows directions." (*Id.*) Dr. Newell's snellen eye examination demonstrated that Plaintiff's vision, without glasses, was 20/30 in the right eye and 20/400 in the left eye. (AR 353.)

Dr. Newell also noted that Plaintiff had hyperactive reflexes on the right at the brachial, patella, and achilles reflexes with Babinski present and abnormal right arm swing as well as abnormal straight away and tandem gait. (AR 355.) Neurological testing showed that Plaintiff had 5/5 strength in his legs and left arm and 4+/5 strength in his right upper extremities.[3] (*Id.*) Dr. Newell concluded that in an eight-hour workday, Plaintiff could stand and walk two to four hours, sit for six hours, and lift or carry ten pounds frequently and ten to twenty pounds occasionally. (AR 353.) He also concluded that Plaintiff could "reach, handle, feel, grasp and finger frequently with the left hand, occasionally with the right." (AR 353-54.) Dr. Newell found that Plaintiff is "still able to open and close the right hand, do finger-to-thumb opposition."

---

[3] A score of 4, listed just below 5 which is normal, indicates "Movement against gravity and resistance (moderate but not normal)." (AR 355.)

3

(AR 354.) Dr. Newell opined that Plaintiff "has some mild, stuttering speech/dysarthria, poor vision out of the left eye, but good vision out of the right eye. No need for an assistive device." (AR 354.)

On December 9, 2009, Plaintiff met with Dr. David W. Hebda based on a referral by rehabilitation services for evaluation of Plaintiff's cognitive functioning. (AR 390 – 404.) As part of the "Behavioral Observations" section, Dr. Hebda noted that Plaintiff "tends to portray himself as being relatively free of common shortcomings to which most individuals will admit, and he appears somewhat reluctant to admit to minor faults. Accordingly, [Plaintiff's] personality profile may underrepresent the extent and degree of any significant problems." (AR 392.)

In the testing conducted by Dr. Hebda, Plaintiff scored average or above average on his working attention span and concentration skills, attention capacity, arithmetic, verbal intellectual skills, visual memory, academic skills, and verbal fluency. (AR 392-93.) Dr. Hebda found that "[d]espite adequate language skills for basic conversation, [Plaintiff] demonstrates a mild dysarthria (speech which is slow, slurred, and difficult to produce) detracting from his ability to communicate verbally." (AR 394.) Plaintiff tested in the "low average range" for "processing speed, verbal information" with a "delay in his ability to process verbal information presented to him." (Id.) Plaintiff also tested low average in nonverbal intellectual skills, verbal learning and memory, and problem solving/mental flexibility. (Id.) Dr. Hebda determined that Plaintiff had deficits in processing speed, visual motor tasks; sensory-motor abilities; attention skills-visual information; alternating attention; and personality variables. (AR 394-95.)

Dr. Hebda concluded that Plaintiff demonstrated "a significant difference between verbal and visual perceptual cognitive functioning with verbal abilities considerably stronger," and that

4

"such individuals tend to perform better in jobs which rely upon verbal rather than visual spatial abilities." (AR 395.) Dr. Hebda also determined that Plaintiff's memory testing showed verbal skills weaker than visual memory abilities and that "elements of daily adjustment and work performance which are dependent on visual memory skills, such as remembering names, dates, procedures, critical events, etc., should be performed without difficulty" as opposed to "[c]omplex verbal instructions which would require some element of repetition." (*Id.*)

Also in December 2009, Plaintiff visited Dr. Mansouri with Access Eye Centers where a visual examination yielded findings of 20/60 vision in the right eye, uncorrected, and 20/400 vision in the left eye, uncorrected. (AR 481-94.) No findings as to the claimants corrected vision were provided. In January 2010, Plaintiff underwent cataract removal of the left eye, after which no further treatment was sought. (AR 20; 481-94.)

Plaintiff submitted four letters on his behalf from two friends/acquaintances, his parents, and his sister, each written in January 2011. (AR 256-59.) These letters describe changes in Plaintiff and his stamina since the stroke and Plaintiff's difficulties communicating, dropping pills, and moving around. (*Id.*)

In February 2011, Plaintiff testified at the hearing before the ALJ. (AR 31 – 73.) Plaintiff testified with regard to his vision that he "had six or seven surgeries on [his] eyes, both eyes" and that in the left eye he had a detached retina. (AR 39.) Plaintiff asserted that his left eye was worse than his right. (AR 44.) Plaintiff estimated that the surgeries took place around 2004. (*Id.*) Plaintiff stated that he has glasses, but he "just didn't wear" them the day of the hearing. (AR 40.) He explained that his glasses are for long distance and do not help him with reading. (AR 50.) Plaintiff described some difficulties in reading sentences, but that these were caused by the 2004 eye surgeries that "burn[ed] off spots." (AR 51.) Plaintiff testified that he

5

wears his glasses based on the light—that it is easier for him to drive during the night when he has "the taillights of the car in front of [him] to judge [his] depth and distance." (AR 43.) Plaintiff could see three-fourths of the ALJ, who was approximately ten feet from Plaintiff, without scanning to get a full picture. (AR 44.) Plaintiff also acknowledged that with his vision he could still use tools such as screwdrivers. (AR 51.)

Plaintiff described his daily activities, including walking a small dog. (AR 46.) Plaintiff watches football games on the PlayStation using his right or left hand to hit a button to select players for his team. (AR 47 – 48.) Plaintiff stated that he can walk "a hundred, 150 yards. The only thing I can relate it to is I go to WalMart and make one lap around and then I'm ready to get back in my car." (*Id.*) He testified that he can stand for fifteen to twenty minutes, had no difficulty sitting, can lift a thirty to forty pound object with both hands, and that he could likely lift a brick with his right arm. (AR 40 – 41.) Plaintiff said that he drops things in his right hand periodically and drops pills "all the time" but that might be "because they're so small." (AR 41.) Plaintiff stated that he drives daily or every other day to the Post Office and every few days to the store. (AR 42-43.) In answering a hypothetical posed by the ALJ, Plaintiff estimated that he could pick a quarter up off the table using only his right hand. (AR 42.) Plaintiff testified that he writes primarily with his right hand and can hold a pen in his right hand, but that sometimes he has a difficult time keeping his hand writing on a line. (AR 51 – 54.)

A vocational expert, Mr. Robert Lester, also testified at the hearing before the ALJ. (AR 62 – 73.) The vocational expert testified that Plaintiff, as described by the ALJ, could perform work as a call-out operator, Dictionary of Occupational Titles (DOT) Number 237.367-014. (AR 64 – 67.) The vocational expert testified that 65,000 jobs existed nationally and 1,000 regionally for an individual of Plaintiff's vocational profile and work capacity. (AR 66 – 67.) The

vocational expert described the position of call-out operator as checking up on references and requiring some writing and occasional key stroking. (AR 68.) The vocational expert concluded that "one needs to be able to function reaching, handling and fingering at least on an occasional basis" to complete the job. (AR 71.)

### III. ANALYSIS

#### A. Determining Disability and Sequential Analysis

To qualify for SSI under § 1382 of the Act, a person under age sixty-five must be disabled and meet income requirements. 42 U.S.C. §1382(a). For this purpose, the Social Security Regulations define "disability" as the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); 20 C.F.R. § 416.905(a). To meet this definition, the claimant must have a "severe impairment" that makes it impossible to do previous work or any other substantial gainful activity that exists in the national economy. *See Heckler v. Campbell*, 461 U.S. 458, 460 (1983).

The Commissioner follows a five-step sequential analysis to determine whether a claimant is disabled. Specifically, the ALJ must consider whether the claimant (1) is engaged in substantial gainful activity;[4] (2) has a severe impairment; (3) has an impairment that equals a condition contained within the SSA's official listing of impairments; (4) has an impairment that

---

[4] Substantial gainful activity is work that is both substantial and gainful as defined by the Agency in the Code of Federal Regulations. Substantial work activity "involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before." 20 C.F.R. § 404.1572(a). Gainful work activity is work activity done for "pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b). Taking care of oneself, performing household tasks or hobbies, therapy or school attendance, and the like, are not generally considered substantial gainful activities. 20 C.F.R. § 404.1572(c).

prevents past relevant work;[5] and (5) has an impairment that prevents him from any substantial gainful employment. 20 C.F.R. § 416.920(a)(4).

## B. ALJ's Findings

Conducting the sequential analysis, the ALJ proceeded through each step and rendered two adverse findings. First, the ALJ found that Plaintiff met the insured status requirement and had not engaged in substantial gainful activity since May 12, 2009. (AR 15.) Next, the ALJ concluded that Plaintiff suffered from the following severe impairments: "late effects of cerebrovascular disease, diabetes mellitus, poor vision of the left eye, and a cognitive disorder." (*Id.*) In evaluating the effect these impairments have on Plaintiff's functioning, the ALJ stated that "these impairments cause more than minimal impact on [Plaintiff's] ability to function during the period." (*Id.*) However, the ALJ determined that these impairments did not amount to a condition contained within the SSA's official listing of impairments. (AR 16.) The ALJ concluded that Plaintiff's "cerebrovascular accident has not resulted in sensory or motor aphasia resulting in ineffective speech or communication or significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station . . . as to meet either provision of listing 11.04." (*Id.*)

The ALJ explained that Plaintiff's vision failed to meet any of the requirements of the listings and that Plaintiff's mental impairment does not meet the criteria of listing 12.02. (*Id.*) The ALJ also determined that the evidence failed to establish paragraph C criteria and that the paragraph B criteria were also not met.[6]

---

[5] Past relevant work is defined as substantial gainful activity in the past fifteen years that lasted long enough for an individual to learn the basic job functions involved. 20 C.F.R. §§ 416.965(a) & 404.1565(a).

[6] The ALJ noted that the paragraph B analysis incorporated the extensive analysis undertaken at step five. (AR 16.)

8

The ALJ determined that Plaintiff has the following functional limitations:

> Claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except he is limited to never climbing ladders, ropes or scaffolds; occasional balancing, stopping, kneeling, crouching, crawling, and climbing of ramps and stairs; never working around hazardous machinery or at unprotected heights; reaching, handling, feeling, grasping and fingering with the left (non-dominant) upper extremity on no more than a frequent basis; and reaching, handling, feeling, grasping and fingering with the right (dominant) upper extremity on no more than an occasional basis. While the claimant has limited vision in the left eye, his level of vision is sufficient to safely drive an automobile. The claimant is limited to unskilled work entailing (as the phrases are commonly understood) jobs that involve simple routine tasks, short simple instructions, and work that needs little or no judgment to do simple duties that can be learned on the job in a short timeframe. The claimant is further limited to jobs that do not require making oral or written reports or reading instructions.

(AR 17.) The ALJ found that Plaintiff was unable to perform past relevant work. (AR 24.) Based on Plaintiff's functional limitations the ALJ concluded that, considering his age, education, work experience, and residual functional capacity, "there are jobs that exist in significant numbers in the national economy that [Plaintiff] can perform." (AR 25.)

As a result of the ALJ's determination that Plaintiff's impairments did not amount to one of the listed impairments, and that jobs existed in significant numbers in the national economy that Plaintiff can perform, the ALJ found that Plaintiff was not disabled within the meaning of the Act. (AR 26.)

### C. Cross-Motions for Summary Judgment

The Plaintiff raises two primary issues in this action: (1) whether the ALJ sufficiently articulated the substantial evidence which supported the ALJ's decision that Plaintiff's medical conditions did not meet the requirements of any listing of impairments; and (2) whether

substantial evidence supports the ALJ's conclusion that Plaintiff retains the residual functional capacity to perform the job of call-out operator. Defendant seeks summary judgment on the ground that the ALJ's decision is supported by substantial evidence, and therefore, should be affirmed. Defendant's briefing focuses on disputing the arguments propounded by Plaintiff. Therefore, the undersigned will address each of Plaintiff's objections to the ALJ's decision in turn.

### 1. ALJ's Duty to Articulate

Plaintiff argues that the ALJ "offers only a one-sentence summary which fails in any way to identify or discuss any evidence of record and compare that evidence to the requirements of the Listing of Impairments; particularly that related to 20 C.F.R. § 404, . . . §11.04 for stroke victims." (Pl.'s Mem. Supp. Mot. Summ. J. at 9.) Plaintiff avers that the ALJ fails to discuss the evidence or why that evidence fails to meet the requirements of the listing. Plaintiff urges the Court to find that the ALJ was required to identify each relevant listed impairment and compare the evidence in this case to each of the listed criteria. (*Id.* at 13 – 15.)

The impairments listings identify those claimants whose impairments are considered to be severe enough to prevent an individual from doing any gainful activity, regardless of his age, education, or work experience. 20 C.F.R. §§ 404.1525(a); 416.925(a); *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990). To meet listing 11.04, a claimant is required to prove a central nervous system vascular accident with either: sensory or motor aphasia resulting in ineffective speech or communication, or significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movements, or gait and station. *See* 20 C.F.R. pt. 404, subpt. P, app. 1, § 11.04. Specifically, persistent disorganization of motor functions typically consists of paresis or paralysis, tremor or other involuntary movements,

ataxia and sensory disturbances which occur singly or in various combinations. *Id.* at Part 404, Subpart P, Appendix 1, 1100C. "The assessment of impairment depends on the degree of interference with locomotion and/or interference with the use of fingers, hands, and arms." *Id.*

"There is no particular language or format that an ALJ must use in his . . . analysis as long as there is sufficient development of the record and explanation of the findings to permit meaningful review." *Clark v. Comm'r of Soc. Sec.*, No. 09-417, 2010 WL 2730622, at *17 (E.D. Va. June 3, 2010) (internal citation omitted). The ALJ's opinion is sufficient if it "not only sets forth the facts used in rendering his decision, but it also provides a thorough examination of the medical evidence." *Id.* This Court is required to view the ALJ's decision as a whole rather than to conduct a piecemeal assessment of specific sentences. *Wilkins v. Sec'y, Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991) (superseded on other grounds).

The Plaintiff is correct that this Court cannot undertake post hac rationalization for the ALJ's decision; however, in this case the ALJ expressly states that he does not find that Plaintiff's impairments meet each claimed listing. For each impairment, the ALJ states that the impairment fails to meet the listing and then goes on to discuss the required criteria for that listing. For example, the ALJ stated that "[t]he claimant's cerebrovascular accident has not resulted in sensory or motor aphasia resulting in ineffective speech or communication or significant and persistent disorganization of motor function in sustained disturbance of gross and dexterous movements, or gait and station . . ., so as to meet either provision of listing 11.04." (AR at 16.) The ALJ similarly states his findings for each of Plaintiff's claimed impairments in that form. Next, the ALJ factually summarizes the activities that Plaintiff could and could not perform and why performing or not performing such activities led him to his conclusion. (*See*

AR at 16.) The ALJ lists specific examples of Plaintiff's abilities which illustrate that Plaintiff is not suffering sustained disturbance of gross and dexterous movements or gait and station.[7]

Although the ALJ does not state after each example of Plaintiff's abilities that that specific ability reflects that Plaintiff is not suffering disturbance in a certain limb, such a statement is not required by law. The case law does not require the detailed analysis that Plaintiff requests nor does it permit this court to conduct the piecemeal assessment requested by Plaintiff. Similarly, the ALJ incorporates his residual function capacity analysis—which lasts more than seven pages and covers all of the evidence submitted—into his determination at step three, specifically as to why Plaintiff does not meet "paragraph B" criteria.

Based upon the ALJ's decision in its entirety, the Court determines that the ALJ sufficiently articulated his findings and rational for a meaningful review and thus, this Court finds no error in the ALJ's determination with respect to Plaintiff's entitlement under the listings of impairments.[8]

## 2. Plaintiff's Ability to Perform Job of Call-Out Operator

Plaintiff alleges that substantial evidence does not support the ALJ's conclusion that Plaintiff retains the residual functional capacity to perform the job of call-out operator. He alleges such based on his conclusions of (1) Plaintiff's inability to communicate effectively and

---

[7] The ALJ cites substantial evidence to support his conclusion that Plaintiff had "no more than mild restriction" specifically that Plaintiff is wholly independent in personal care, goes outside daily without assistance, drives, shops in stores, and watches television. Although Plaintiff said his parents prepare his meals, as the ALJ noted, it is not clear whether that is because he cannot or some other reason. Thus, there is substantial evidence in the record to support the ALJ's conclusion that Plaintiff does not suffer from persistent disorganization of motor functions typically consisting of paresis or paralysis, tremor or other involuntary movements, ataxia and sensory disturbances which occur singly or in various combinations.

[8] This Court gave no weight to the Defendant's characterization of Plaintiff's symptoms in Defendant's briefing. The Defendant's characterization is inconsequential; the Court looked only to the reasoning articulated by the ALJ and the administrative record as a whole.

12

efficiently, (2) Plaintiff's deficits in processing speed on visual-motor tasks, and (3) Plaintiff's inability to use his right hand.[9]

In reviewing the Commissioner's decision to deny benefits, this Court is limited to determining whether that decision was supported by substantial evidence on the record, and whether the proper legal standard was applied in evaluating the evidence. 42 U.S.C. § 405(g); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Substantial evidence is the kind of relevant evidence a reasonable mind could accept as adequate to support a conclusion; it is more than a mere scintilla but less than a preponderance. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). In reviewing the entire record for substantial evidence, the Court does not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Masiro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001). The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed. *Perales*, 402 U.S. at 390. While the standard is not high, if the ALJ's determination is not supported by substantial evidence on the record, or if the ALJ has made an error of law, the district court must reverse the decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). With this standard in mind, the Court next evaluates the ALJ's findings and decision.

---

[9] It appears Plaintiff attempts to assert a fourth reason why Plaintiff cannot complete the job of call-out operator in his Reply brief, namely whether Mr. Gassaway retained the cognitive abilities to perform the job. If an argument first arises in a reply brief, that argument is not properly before the Court for review. This Court recognizes that in this unique joint briefing schedule (Dkt No. 17) Plaintiff's brief serves as both a reply memorandum in support of his motion combined with his opposition to Defendant's cross-motion. However, there is insufficient evidence in the administrative record to determine, as Plaintiff seeks, that Plaintiff's cognitive functioning shows he is unable to perform the work. Regardless of whether Plaintiff's symptoms are characterized as intellectual functioning or cognitive processes, there is substantial evidence in the record, as described *infra*, to conclude that Plaintiff had the requisite cognitive functioning to perform the job of call-out operator.

### a. Plaintiff's Ability to Communicate Effectively and Efficiently

A call-out operator must "telephone the subscriber to relay requested information"—the operator must be able to convey information verbally. (AR 68.) Plaintiff cites Dr. Hebda's evaluation that Plaintiff has mildly dysarthic speech (AR 309), the Social Security intake employee's note that Plaintiff's "speech was slurred" (AR 207), and the several letters from Plaintiff's friends and family (AR 256, 258, 259) as evidence that Plaintiff cannot communicate verbally sufficient to perform the job of call-out operator.

When discharged after his stroke in May 2009, Plaintiff's speech remained slurred, but there is substantial evidence in the record supporting a finding that Plaintiff verbally conveys information sufficient to perform the job of call-out operator. Plaintiff's interview with the Social Security employee occurred only a month after Plaintiff's stroke and the employee only noted that "speech was slurred." (TR. 207 – 208.) Strikingly, the Social Security employee did not state that he/she could not understand what Plaintiff was conveying during the interview. In addition, both examining doctors concluded that Plaintiff's speech was either mostly comprehendible or sufficient for conversational exchange. In September 2009, Dr. Newell found that Plaintiff had some mild stuttering with soft speech, but was comprehensible for the most part. In December 2009, Dr. Hebda found that Plaintiff had mildly dysarthic speech, but that his speech was sufficient for conversational exchange. Dr. Hebda also concluded that Plaintiff could participate in a variety of occupational tasks at the competitive level, never noting his ability to communicate as a restriction. The ALJ also had the opportunity to hear the Plaintiff verbally communicate at the February 2011 hearing. (AR 33 – 62.)

The ALJ also detailed his consideration of the third party written statements filed by Plaintiff's friends and family. (AR 23.) The ALJ fully considered the letters, but gave them

14

minimal weight because "they are not fully objective sources, nor do they possess specialized education, training, or experience." (*Id.*) The Plaintiff cites no case law requiring the ALJ give the letters greater weight such as the probative weight given to doctor's opinions which are supported by medical treatment evidence. Thus, there is no basis for this Court to conclude that the ALJ erred when he determined the medical opinions of the two doctors were sufficient basis for his conclusion that Plaintiff could communicate effectively sufficient to perform the job of call-out operator.

### b. Plaintiff's Processing Speed on Visual-Motor Tasks

Based on Dr. Hebda's characterization of Plaintiff's processing speed on visual-motor tasks as "extremely low" and "severely impaired" and Dr. Hebda's recommendation that Plaintiff "should be provided with additional time periods to complete assigned tasks," Plaintiff concludes that he cannot complete the job of call-out operator—specifically that Plaintiff cannot fill out a form to record information obtained over the telephone. (Pl.'s Mem. Supp. Summ. J. at 18.)

The ALJ concluded that Plaintiff had the residual functional capacity to perform unskilled work involving simple routine tasks, short simple instructions, and work that needs little or no judgment. This conclusion is supported by substantial evidence in the record. Dr. Hebda's report does not contravene the ALJ's finding. In fact, as the government pointed out, Dr. Hebda was a one-time examiner rather than a treating physician, and thus, the ALJ is not required by law to give Dr. Hebda's opinion controlling weight. In making his determination, the ALJ cited both Dr. Hebda's finding that Plaintiff's ability to participate in visual motor tasks that require speed and efficiency may be limited and Dr. Hebda's occupational recommendations noting that Plaintiff's visual-motor skills are sufficient for protecting personal safety. Dr. Hebda

concluded that Plaintiff could participate in variety of occupational tasks at the competitive level. Dr. Hebda also specifically concluded that Plaintiff could perform work that depended on visual memory skills such as remembering names, dates, procedures, and critical events and could do so without any difficulty.

Additionally, the evidence submitted regarding Defendant's eyesight does not provide sufficient basis for an adverse finding against the ALJ's determination. The visual examination conducted in December 2009 found Plaintiff had 20/60 vision in the right eye and 20/400 vision in the left eye. Plaintiff testified that he had glasses that assisted with distance viewing, but that the glasses did not assist him in reading. Plaintiff testified that he walks, drives, shops, and takes care of himself without assistance. Similarly, Dr. Newell concluded that Plaintiff had poor vision in left eye, but good vision out of right eye and Plaintiff had no need for an assistive device.

### c. Plaintiff's Ability to Use his Right Hand

Plaintiff asserts that a call-out operator is required to use his right hand at least one-third of the day and since Plaintiff is unable to use his hand for that extended period of time, Plaintiff is unable to perform any substantial gainful activity. (AR 71 – 72.) Plaintiff questions how the ALJ "pick[ed] Dr. Newell's opinion over the testimony of [Plaintiff]" and seeks a more detailed explanation from the ALJ regarding "why Dr. Newell's assessment is worthy of more weight than Mr. Gassaway's testimony." (Pl.'s Mem. Supp. Summ. J. at 19, 20.)

The ALJ explained the weight given to all of the evidence and testimony received. With regard to Plaintiff's testimony the ALJ stated,

> After careful consideration of the evidence, the undersigned finds that the Claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the Claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to

the extent they are inconsistent with the above residual functional capacity assessment.

(AR 19.) The ALJ also opined, "Dr. Newell [sic] opinion . . . is given great probative weight because it is well-supported by a detailed report of examination and consistent with the medical treatment evidence of record." (AR 23.) The Plaintiff cites no case law requiring that the ALJ describe the weight given to testimony in comparison to other supported evidence. The ALJ's articulation is sufficient for review of whether that weight is appropriate and a more detailed explanation is not required.

There is also substantial evidence supporting the ALJ's finding that Plaintiff can reach, handle, feel, grasp and finger with his right hand on no more than an occasional basis. In that regard, Dr. Newell concluded that Plaintiff can reach, handle, feel, grasp and finger occasionally with his right hand. Dr. Newell also attested that Plaintiff is able to open and close his right hand and complete finger-to-thumb opposition. Plaintiff testified that he can grasp with his right hand. Although Plaintiff drops things in his right hand, specifically pills, he said this could be because the pills are so small. Plaintiff stated that he believed he could pick up a quarter from a table with his right hand and that he could probably use a screwdriver. Plaintiff also writes primarily with his right hand, although he has trouble keeping his writing on a line. Plaintiff is also able to select the players for his videogame with his right hand similar to the occasional keystroking required of a call-out operator.

This Court's role is not to weigh the conflicting evidence or substitute its judgment for that of the ALJ. Based on the Court's thorough review of the record and the ALJ's decision, this Court finds that the ALJ properly reviewed Plaintiff's medical treatment records and relied on substantial evidence in arriving at the residual functional capacity assessment. Plaintiff's assertion otherwise is unavailing and unsupported by the record. In undertaking this review, the

Court concludes that the ALJ's decision is supported by substantial evidence, and summary judgment should be granted in favor of Defendant.

## IV. CONCLUSION

For the foregoing reasons, the Court finds the ALJ's decision is supported by substantial evidence and does not contain legal error. Therefore, the Motion for Summary Judgment by Defendant, Carolyn W. Colvin, Acting Commissioner of Social Security, shall be GRANTED, and the Motion for Summary Judgment by Plaintiff, Jeffrey Gassaway, shall be DENIED. An appropriate Order will follow.

/s/
Ivan D. Davis
United States Magistrate Judge

May 28, 2013
Alexandria, Virginia